UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 25-CR-155-BHL

ANKURKUMAR BHANUBHAI PATEL,

Defendant.

---

**UNITED STATES' SENTENCING MEMORANDUM**

---

The United States of America, by and through its attorney, Peter J. Smyczek, Assistant United States Attorney for the Eastern District of Wisconsin, hereby submits this sentencing memorandum. The United States of America respectfully recommends that the Court impose a variance sentence of 85 months consistent with the plea agreement, and consistent with the factors set forth in 18 U.S.C. § 3553.

## I. Introduction

The defendant, Ankurkumar Bhanubhai Patel conspired with others to help scam elderly victims out of their retirement and/or life savings by retrieving over $1.5 million from them, and then after taking a cut, transmitting the money back to his criminal associates through anonymous, hand-to-hand transactions. Mr. Patel knew the nature of the scam, knew what he was doing, and did it anyway. As the victims in this case state, the conduct of Mr. Patel and his associates altered their lives,

possibly forever. Mr. Patel's actions should have proportionately serious consequences.

However, there are two reasons for a downward variance. First, the defendant debriefed with the United States. Although the information he provided was limited, it weighs in his favor. In addition, a variance sentence in this case would help avoid an unwarranted disparity under 18 U.S.C. § 3553(a)(6). In another case of a pseudo federal agent/courier, *United States v. Shah*, 25-CR-161, this Court sentenced the defendant to 48 months. This sentence was approximately 85% of the low end of the advisory guideline range. A sentence of 85 months in this case represents approximately 78% of the low end of the advisory guidelines.

## II. Sentencing Calculation

In fashioning a sentence, the Court should begin "by correctly calculating the applicable Guidelines range." *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013) (quoting *Gall v. United States,* 552 U.S. 38, 49 (2007)). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49. After determining the Guidelines range, the Court must look to the factors set forth in 18 U.S.C. § 3553(a) to fashion a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

As noted in the Presentence Investigation Report ("PSR"),[1] the count of conviction and the pseudo wire fraud count are grouped under U.S.S.G. § 3D1.2(d)

[1] References to the PSR herein are to the initial, disclosed PSR.

because the offense level is determined largely by total loss. *See* PSR, ¶ 42. Based on the base offense level, the enhancements, and the reductions for acceptance of responsibility, the adjusted offense level is 31. *See* PSR, ¶ 57. The parties do not dispute that Mr. Patel falls into Criminal History Category of I, and therefore the resulting advisory guideline imprisonment range would be 108 to 135 months. *See* PSR, ¶ 104.

## II. The Appropriate Sentence

### A. The Nature & Circumstances of the Offense

Over the course of several months in 2023, Mr. Patel facilitated the theft of more than $1.3 million (actual loss) from multiple innocent elderly victims, including one Vietnam War veteran and his wife. Mr. Patel conspired to retrieve money from at least 6 elderly victims and then pass that money off to other conspirators designed to disguise the nature of the criminal proceeds and insulate himself and the other criminal actors responsible. Mr. Patel knew he was stealing money from elderly victims, and knew the conduct was illegal and wrong. *See* PSR, ¶ 22-23. It is certainly possible that had Mr. Patel not been arrested during a sting operation, his conduct may have continued unabated. Indeed, Mr. Patel engaged in this conduct not once, not twice, but at least nine (9) times until he was caught. He also recruited at least three other people to join him in robbing elderly Americans. *See id.* at ¶¶ 19, 21. And after one of Mr. Patel's recruits (D.N.) was arrested in Illinois, Mr. Patel was recorded on a phone call telling D.N. to lie to police about the source of the victim money. *See*

*id.* at ¶ 20. According to D.N., he gave Patel $10,000 from one of his pickups. *Id.* at ¶ 19.

Although Mr. Patel did not personally call the victims and convince them to part with their money, he played a crucial role. While fraudsters overseas serve as the brains of the operation, Mr. Patel and others like him act as the hands and feet of these organizations. Mr. Patel's role was important, as the fraudsters need someone in the U.S. willing and able to pick up the proceeds from the victims. Mr. Patel dutifully played his role in helping the fraudsters disguise their crimes and obtain the fruits of their scheme. He helped ensure that these scams continued and operated profitably.

These scams are getting worse, as the losses victims suffer are trending upward. As of 2023, there were more than 50,000 victims with losses exceeding $1.2 billion. *See* https://www.ic3.gov/crimeinfo/techsupportgovimpersonation. The victims are typically elderly, as they were in this case, and they often lose their entire life savings. *See* https://www.ic3.gov/PSA/2023/PSA230929. At least one of the victims in this case did in fact lose the savings he/she built up over 30 years. *See* V.I.S. of M.J.

M.J. is now "living off of [his/her] social security and small pension," has "had to change [his/her] way of living," and "worr[ies] about paying necessary bills." *See id.* M.J. has even had to "cut back" on his/her grocery bills and now "den[ies] [him/herself] any luxury." Similarly, Victim M.R. now has to explain to his/her special needs daughter that he/she can no longer afford to bring her to Disney World as he/she had promised, because "there [i]s no money." *See* V.I.S. of M.R., ¶ 4. M.R. also

needs to pick which repairs/bills to pay, cannot afford nights out with friends, and cannot afford to help his/her grandchildren with college. *See id.* at ¶¶ 1-3.

The fraudsters for whom Mr. Patel worked likely reside overseas. These scammers are the originators of these fraud schemes and they profit the most. The United States is working to investigate and charge these criminal actors. However, Mr. Patel's role was an important one, and for which he should be held accountable.

Although he had more than enough time to reflect and reconsider, at no point did Mr. Patel express his hesitation or unwillingness to participate. When he was arrested in Missouri in 2023, he initially denied knowingly picking up money. He then later admitted to the conduct, but only admitted to picking up money three times. *See* PSR, ¶ 22.

**B. History & Characteristics of the Defendant**

The defendant came from a loving home, raised by two hard working parents. *See* PSR, ¶¶ 66-75. For his part, Mr. Patel was a successful businessman who has owned and operated two profitable businesses and a rental home. *See id.* at ¶ 84, 96-102. In other words, for years the defendant has had a stable, legitimate means of earning money. "Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999). Mr. Patel was neither desperate for money nor unable to provide for himself. On the contrary, he was driven instead by

greed, and he knowingly helped scam vulnerable victims out of their life savings so he could earn some extra cash.

Mr. Patel has accepted responsibility for his conduct and pled guilty. And on January 12, 2026, he came to the U.S. Attorney's Office for a proffer interview. When confronted with evidence of additional victims/pick-ups, Mr. Patel acknowledged and admitted the conduct. Although the information he provided was rather limited and did not prove useful, his willingness to plead guilty and give a proffered statement can mitigate his sentence. *See United States v. Robinson*, 741 F.3d 588, 599 (5th Cir. 2014) (sentencing court may consider cooperation under § 3553(a) in the absence of a 5K motion).

**C. Deterrence and Just Punishment**

1. General Deterrence

The goal of general deterrence is also important in offenses such as these. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting in part Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After* Booker, 47 WM. & MARY L. REV. 721, 724 (2005)); *see also United States v. Hayes*, 62 F.3d 1300, 1308 (11th Cir. 2012) ("general deterrence is an important factor in white-collar cases, where the motivation is greed").

Call-center schemes depend on individuals in the United States who are willing to pick up fraud proceeds. This inherently involves a calculation that the risk of apprehension and/or punishment is worth the payout. It is important that the sentence in this case be enough to deter other individuals from willingly and readily joining and assisting these schemes as pseudo federal agents/couriers.

2. Just Punishment

Finally, "the primary purpose of a sentence is 'to provide just punishment for the offense.'" *See United States v. Nigg*, No. 10-CR-273, 2011 WL 5358687, at *7 (E.D. Wis. May 5, 2011) (citing 18 U.S.C. § 3553(a)(2)(A)). Concern that "white-collar offenders" received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the Sentencing Guidelines. S. REP. NO. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. "[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes." *Accord*, *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006).

The statutory maximum in this case is 20 years, and the advisory guidelines range is 108-135 months. *See* 18 U.S.C. § 1956(h); PSR ¶ 104. For this repeated conduct targeting vulnerable elderly victims and in which the defendant recruited others to join him, a variance sentence of 85 months is a just punishment for the offense, and sufficient but not greater than necessary to comply with the goals of sentencing.[2]

[2] The defendant may also be eligible for reduced custodial opportunities including federal Good Conduct Time ("GTC"), which can be up to 54 days for every year imposed, or approximately 15% of a total sentence. *See*

## Conclusion

For these reasons, the United States recommends a sentence of approximately 85 months imprisonment.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2026.

Respectfully submitted,


By: *s/Peter J. Smyczek*
PETER J. SMYCZEK
Assistant United States Attorney
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave., Room 530
Milwaukee, WI 53202
Tel: (414) 297-1700
Fax: (414) 297-1738
Email: peter.smyczek@usdoj.gov


---

https://www.ussc.gov/education/first-step-act-earned-time-credits Some inmates may also be eligible for the First Step Act Earned Time Credits. *See* https://www.justice.gov/archives/opa/pr/justice-department-announces-new-rule-implementing-federal-time-credits-program-established